LOMBARD S. S. CO., Limited, v. LANASA & GOFFE S. S. & IMPORTING CO. OF BALTIMORE CITY.

(District Court, D. Maryland. July 1, 1908.)

1. SHIPPING—CHARTER—DAMAGES FOR FAILURE TO DELIVER VESSEL.
   The failure to deliver a ship under a charter at the time agreed upon when she was to start on a voyage to Jamaica for a cargo of bananas, in consequence of which the voyage was not made, did not entitle the charterers to recover as damages from the owners the value of bananas which in the meantime were lost by being blown down by a storm, but which had not been cut and prepared for shipment in anticipation of the ship's arrival; the proximate cause of the loss being the storm, and not the default of the vessel.

2. SAME—CHARTER HIRE.
   A steamship was chartered by respondents for a term of six months for a monthly hire. It was understood by both parties that with other vessels she was to be used in making regular trips from Baltimore to Jamaica for bananas; a round voyage being made every two weeks. She was to be delivered on March 5th to start on the first voyage, but was not tendered until the 11th, when respondents refused to receive her until the 19th, the time she should have started on her second voyage. She was then delivered and completed the charter. Held, that respondents were within their rights and were liable for her hire only from the 19th.

In Admiralty. Suit for charter hire.

George Whitelock and John B. Deming, for libelants.
Robert H. Smith and William P. Hall, for respondents.

MORRIS, District Judge (orally). This was a charter party between the agent for the owners of the steamship Oxus and the respondents, who are importers of bananas in Baltimore, for the use of the ship for six months at an agreed sum per month. There had been a previous charter of the ship, and each party knew exactly what use the ship was chartered for; that is to say, she was chartered to run on regular voyages to bring fruit from Jamaica to Baltimore in connection with other steamers running regularly, and arranged to arrive in Baltimore one or two steamers a week. The ship was to be delivered to the charterers on the 5th of March. Repairs having been made upon her to a considerable amount, the shipwrights refused to deliver her until their bill was paid. The owners and the principal agent being in London, there was delay in providing the money. It resulted in the ship being libeled and detained until the 11th of March. On that date the charterers refused to take her. They said:

"The purpose of our sending her out, as you well knew, necessitated our sending her out on the 5th of March. The purpose of that voyage has been frustrated by her detention, and therefore we will not take her until we would have sent her out on the next turn of her trip to Jamaica, which would be on the 19th."

163 F.—28

On the 19th she was again tendered and was accepted and kept in use for the remainder of six months for which she was chartered. In the interval between the 5th of March and the 19th, there had been a loss of fruit in the island of Jamaica, and it is that loss which the respondent is now attempting to charge against the steamer—that is to say, to deduct it from the hire which would otherwise be due—and the question the court has to determine as to that is: First, whether it was such a loss as is properly chargeable against the steamer; and, second, is the loss sufficiently proved in order to enable the court to state just what that loss was.

The agreement being to deliver the vessel to the charterers on the 5th of March, and the business she was chartered for being known, if the charterers had ordered the fruit to be cut and ready for her, I think that the charterers would be entitled to recover the loss, if any had happened by the overripening of the fruit. If they had ordered a specific cargo to be prepared, and that fruit had been prepared and cut for shipment, if there was a loss by the decay of the fruit, I think that would be a loss which could be recovered as damages; but in this case now in hand there was no cargo cut and prepared for shipment. The charterers had general contracts with the growers of fruit in Jamaica to take their fruit, and under the contracts the growers of the fruit were entitled to notice, and were not to cut the fruit for shipment and delivery until they were notified of the expected arrival of the steamer. (The court here quoted the clause referred to from one of the contracts). So it was not a purchase of a specific lot of fruit, but the fruit was not to be cut for delivery until notice was given and ships were provided. On the 5th of March, the day on which the ship was held up by the libel of the shipwrights, there was a cablegram sent to the agents of the charterers in Jamaica, stating that the ship was detained and would not sail, and thereupon they gave directions to the different plantations from which they expected to receive the fruit not to cut until they were notified. The fruit did not rot on the trees, but there came a windstorm during the week when the steamer would have arrived, if she had sailed on the 5th of March, which blew down considerable fruit, it may be assumed the fruit which was nearest approaching to ripeness, and that fruit was lost because it was blown down, but not because it was overripe.

It does not seem to me that the proximate cause of the loss of that fruit was the nonarrival of the Oxus. It was the windstorm which blew it down. If it had not been blown down, it could have been used for loading subsequent steamers which were arriving weekly making regular trips.

For another reason I should have great difficulty, if I thought the loss was chargeable against the steamer, in determining what was the amount of the loss—what was the damage that was done. The witnesses are all exceedingly loose in their statements of how much fruit was blown down by this breeze. They refused to exhibit their books in which they had recorded the number of bunches. They had no original memoranda; the original memoranda having been taken very loosely on banana leaves on the plantation, and were destroyed. The parties refused to produce their books, and there was no means

of determining whether the claim they then made, at the time of taking the testimony, was the same claim they made at the time of entering upon their books the loss by the storm. In a case of this kind there ought to be very clear proof of the loss, if it is to be allowed. I should, on that ground, refuse to sustain the contention of the respondent in the case.

There only remains the question from what day the hire of the ship is to be calculated. It is admitted that it could not be claimed before the 11th of March, when the ship was tendered. On that day the charterer refused to receive her, and for good reason. The respondents then claimed that they had chartered the ship for a definite purpose known to the owners, and if she was sent out on the 11th of March the charterers would have three vessels returning to Baltimore at the same time loaded with fruit, and there would probably be a glut and a loss, and they refused to accept the ship then. It does not seem to me that was unreasonable, as the delay had frustrated the purpose for which the ship was chartered. But on the 19th, which would have been the sailing date for the second voyage if the ship had been delivered on March 5th, the respondent did accept her and sent her out. That delivery seems to have been in a way agreed to. At any rate, the parties thereafter went on under the charter as if it had begun on March 19th, for the six months which it had to run. I think that, as the charter party provides that the charterer shall pay for the use of the ship the stipulated hire per month, the respondents are only chargeable for the time they actually had the vessel in use, which was from the time of the delivery to them of the vessel on the 19th of March.